IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ALBERT DANTZLER, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| vs. | ) | Civil Action 05-1727 |
| | ) | |
| Secretary JEFFREY BEARD, Executive | ) | |
| Secretary JOHN SHAFFER, WILLIAM | ) | Judge David S. Cercone/ |
| STICKMAN, Regional Deputy Superintendent, | ) | Magistrate Judge Amy Reynolds Hay |
| JOHN DOE, Classification Officer, LANCE | ) | |
| COUTERIER, Chief Psychologist, FRED MAUE, | ) | |
| Chief Psychiatrist, JOSEPH FOLINO, Super- | ) | |
| intendent of SCI-Greene, KEN  MILLER, Unit | ) | |
|  Manager, HARRY WILSON, Superintendent of | ) | |
| SCI-Fayette, | ) | |
| | ) | |
| Defendants | ) | |
| | ) | Re: Dkt. [56] |

REPORT AND RECOMMENDATION

## I.     RECOMMENDATION

It is respectfully recommended that the Defendants' motion for summary judgment be
granted.

## II.     REPORT

### A.  Relevant Procedural History

This case has been the subject of prior proceedings, including a report that  recommended

dismissal of all but three of Plaintiff's claims, Dkt. [27].  The report was adopted by the District

Court.  Dkt. [33].  Familiarity with those prior proceedings and report are presumed.  The only

three remaining claims are: (1) that Albert Dantzler ("Plaintiff") was deprived of procedural due

process when he was placed in the Special Management Unit ("SMU") and the Long Term

Segregation Unit ("LTSU"), (2) that the conditions of those placements amounted to cruel and unusual punishment in violation of the Eighth Amendment and (3) that his placement and his being continued therein violated his equal protection rights because white inmates were allegedly treated better than he in being let out of the LTSU more quickly than black inmates. Because Plaintiff has failed to show that he had a liberty interest to remain free from those constraints and/or because he has failed to show that the process he was provided was inadequate, Defendants are entitled to summary judgment on the procedural due process claim. In addition, because Plaintiff has failed to adduce evidence that the conditions of these placements deprived him of the minimal civilized measure of life's necessities, Defendants are entitled to summary judgment as to his Eighth Amendment claim as well. Finally, because he has failed to show he was similarly situated with the other inmates allegedly treated better than he, his equal protection claim fails to survive summary judgment.

Defendants filed a summary judgment motion, Dkt. [56], a brief in support, Dkt. [57], and a statement of facts. Dkt. [58]. Appended to the motion were evidentiary materials. Plaintiff filed a response in opposition to the Defendants' summary judgment motion, Dkt. [70], with appended evidentiary material; in addition, Plaintiff filed a brief in opposition, Dkt. [71].

**B. Applicable Legal Standard**

Summary judgment is appropriate if, drawing all inferences in favor of the non-moving party, "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Summary judgment may be granted against a party who fails to adduce facts sufficient to establish the

existence of any element essential to that party's case, and for which that party will bear the burden of proof at trial. Celotex Corp. v. Catrett, 477 U.S. 317 (1986). The moving party bears the initial burden of identifying evidence which demonstrates the absence of a genuine issue of material fact. Once that burden has been met, the non-moving party must set forth "specific facts showing that there is a *genuine issue for trial* ... or the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law. Matsushita Electric Industrial Corp. v. Zenith Radio Corp., 475 U.S. 574 (1986). An issue is genuine only if the evidence is such that a reasonable jury could return a verdict for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986). Thus, it must be determined "'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" Brown v. Grabowski, 922 F.2d 1097, 1111 (3d Cir. 1990), cert. denied, 501 U.S. 1218 (1991), quoting Anderson v. Liberty Lobby, Inc., 477 U.S. at 251-52.

### C. Discussion

#### 1. Procedural Due Process

The Fourteenth Amendment provides in relevant part that "nor shall any State deprive any person of life, liberty, or property, without due process of law." The "due process of law" essentially requires that the government provide a person notice and opportunity to be heard in connection with the deprivation of life, liberty or property. Zappan v. Pennsylvania Board of Probation and Parole, 152 Fed.Appx. 211, 220 (3d Cir. 2005)("The essential requirements of any procedural due process claim are notice and the opportunity to be heard."). Hence, to establish a

prima facie case of a procedural due process violation, a plaintiff must establish[1] (1) the existence of a liberty or property interest (2) that the state deprived the person of and (3) that the deprivation was accomplished without procedural protections of notice and an opportunity to be heard. See Rusnak v. Williams, 44 Fed.Appx. 555, 558 (3d Cir. 2002)("Procedural due process claims, to be valid, must allege state sponsored deprivation of a protected interest in life, liberty or property. If such an interest has been or will be deprived, procedural due process requires that the governmental unit provide the individual with notice and a reasonable opportunity to be heard.")(citation omitted); Castro Rivera v. Fagundo, 310 F.Supp.2d at 434 (listing elements of prima facie case).

For present purposes, our procedural due process analysis involves a two step inquiry: the first question to be asked is whether the complaining party has a protected liberty or property interest within the contemplation of the Due Process clause of which he has been deprived and, if so, the second question is whether the process afforded the complaining party to deprive him of that interest comported with constitutional requirements. Shoats v. Horn, 213 F.3d 140, 143 (3d Cir. 2000).

Defendants argue that Plaintiff has failed to establish that his placement in the SMU and/or LTSU deprived him of a liberty interest. Dkt. [57] at 5 to 6. Alternatively they point out

---

[1] It is clear that Plaintiff has the burden. See, e.g., Smith v. City of Unadilla, 510 F.Supp.2d 1335, 1346 (M.D. Ga. 2007)("A plaintiff who asserts that a procedural due process violation has occurred, bears the initial burden of establishing that a protected property interest exists."); Castro Rivera v. Fagundo, 310 F.Supp.2d 428, 434 (D.Puerto Rico 2004)("It is not sufficient that a deprivation has occurred. Plaintiffs carry the burden of pointing to the lack of constitutionally sound proceedings at the state level. *Rumford*, 970 F.2d at 999. Plaintiffs must present evidence that the state does not have available review mechanisms comporting with minimum due process requirements."), *aff'd.* 129 Fed.Appx. 632 (1st Cir. 2005).

that Plaintiff received all of the process to which he was entitled even if his placement involved a liberty interest.  Dkt. [57] at 7 to 15.

A protected liberty interest may arise from one of two sources: (1) directly from the Fourteenth Amendment's due process clause itself or (2) from state law.  Hewitt v. Helms, 459 U.S. 460, 466 (1983).

There is no liberty interest created directly by the Fourteenth Amendment that prevents an inmate from being subjected to programs such as the SMU and/or the LTSU.  See Sandin v. Conner, 515 U.S. 472, 484 (1995) ("Conner asserts, incorrectly, that any state action taken for a punitive reason encroaches upon a liberty interest under the Due Process Clause even in the absence of any state regulation"); Stephany v. Wagner, 835 F.2d 497, 499 (3d Cir. 1987)("the Due Process Clause does not give a prisoner a liberty interest in remaining in the general prison population").

Nevertheless, Plaintiff appears to attempt to bring himself within a class of cases that hold involuntary psychiatric treatment implicates a liberty interest that is derived directly from the Due Process clause.  Dkt. [71] at 6 to 7.  The class of cases has its origins to a great extent in the Supreme Court's decision of  Vitek v. Jones, 445 U.S. 480 (1980), which Plaintiff cites.  Dkt. [71] at 7.  In that case, a prisoner was transferred to a hospital for the mentally ill and involuntarily subjected to treatment including use of psychoactive drugs.  See, e.g., Miller v. Vitek, 437 F.Supp. 569, 572 (D. Neb. 1977)("Patients there, including inmates transferred from the Penal Complex, are frequently required to participate in behavior modification programs **and**

to take whatever medication may be prescribed for them.")(emphasis added).[2]  Some prisoners so

transferred brought suit alleging a violation of their procedural due process rights contending that

they had a liberty interest in not being so transferred without some pre transfer process of notice

and an opportunity to be heard.  The Supreme Court agreed, holding that

> the District Court was convinced that characterizing Jones as a mentally ill patient
> and transferring him to the Lincoln Regional Center had "some stigmatizing"
> consequences which, together with the mandatory behavior modification
> treatment to which Jones would be subject at the Lincoln Center, constituted a
> major change in the conditions of confinement amounting to a "grievous loss" that
> should not be imposed without the opportunity for notice and an adequate hearing.
> We agree with the District Court.

Vitek v. Jones, 445 U.S. 480, 488 (1980).   The Court in Vitek found that the liberty interest was

both a state created liberty interest and a liberty interest directly created by the Due Process

clause.   See, e.g.,  Kritenbrink v. Crawford, 457 F.Supp.2d 1139,1149 n.6 (D.Nev. 2006)("The

Supreme Court in *Vitek* found that classifying a prisoner as mentally ill and transferring him to a

mental hospital for mandatory behavior modification treatment implicated a state-created liberty

interest as well as a liberty interest arising from the Due Process Clause itself.").  In finding a

state created liberty interest, the Supreme Court engaged in the now rejected (as explained

below) Hewitt-type methodology of looking for mandatory language in state regulations.

Accordingly, the Vitek Court's holding with respect to the state created liberty analysis is

superceded by Sandin.  Hence, we need address only the Vitek holding as to a liberty interest

directly created by the Due Process clause. We find Vitek and its line of cases to be

distinguishable insofar as the Court found that transfer to a mental hospital combined with

_____

[2]  The Miller decision is the case in the District Court that eventually resulted in the Supreme
Court decsion in Vitek v. Jones.

involuntary psychiatric treatment that the court characterized as "behavior modification" implicated a liberty interest.

Plaintiff seizes on the term of "behavior modification" from <u>Vitek</u>, as well as upon the concession by a DOC official that "by definition, behavior modification is utilized in the LTSU." Dkt. [70-19] at 2. Plaintiff argues that because <u>Vitek</u> held that transfer to a mental hospital that engaged in behavior modification implicated a liberty interest created directly by the Due Process clause, his transfer to the LTSU which utilizes "behavior modification" likewise implicates a liberty interest. The problem with Plaintiff's argument is the logical problem known as equivocation, i.e., simply because the same words were used the same meanings must be indicated. However, as noted by one court: "the problem in discussing 'behavior modification' is that the term is defined in a number of different ways. He explained that 'In its broadest sense, virtually every program in the Bureau of Prisons is designed to change or modify behavior." <u>Clonce v. Richardson</u>, 379 F.Supp. 338, 343 (W.D. Mo. 1974).[3] The court finds that the "behavioral modification" referred to in <u>Vitek</u>, was of the kind that necessarily involved psychiatric treatment, including, but not limited to the involuntary administration of psychotropic drugs. <u>See</u>, <u>e.g.</u>, <u>Vitek v. Jones</u>, 445 U.S. at 494 ("But here, the stigmatizing consequences of a transfer to a mental hospital for **involuntary psychiatric treatment**, coupled with the subjection of the prisoner to mandatory behavior modification **as a treatment for mental illness**, constitute the kind of deprivations of liberty that requires procedural protections.")(emphasis added). <u>See also</u> <u>Cooper v. Garcia</u>, 55 F.Supp.2d 1090, 1101 (S.D. Cal. 1999)("In *Vitek v. Jones*, 445 U.S.

---

[3] To the extent that the holding of the court in <u>Clonce</u> is inconsistent with the holding herein, the Court notes <u>Clonce</u> is not mandatory authority and hence is only persuasive authority. As such, it is authoritative only to the extent persuasive and this court is not persuaded by its reasoning.

480, (1980), the Court found the prisoner plaintiff's liberty interest was affected by virtue of him being classified as mentally ill which mandated that he be transferred to a mental hospital for involuntary psychiatric treatment (mandatory behavior modification).").

In contrast, the behavior modification at issue here, for all that the record evidence shows, is a carrot and stick approach, i.e., Plaintiff's negative behaviors are negatively reinforced or "punished" by a substantial loss of privileges upon his transfer to the LTSU and Plaintiff is encouraged to engage in good behavior by the incentive of granting greater privileges as he continues to engage in positive behaviors. Such behavior modification appears throughout the penal system, such as, for example, the stick of incarceration at a greater security classification and/or higher security prison with the carrot of greater privileges in lower security prisons or the carrot of parole should the inmate conduct himself properly. The use of such behavior modification techniques as those utilized in the LTSU simply do not constitute a liberty interest within the contemplation of Vitek because the behavior modification there and the behavior modification at issue herein are substantially different. See, e.g., Neal v. Shimoda, 131 F.3d 818, 830 (9th Cir. 1997)("The liberty interest implicated by the establishment of the SOTP [i.e., a type of behavior modification program] is not merely the requirement that sex offenders complete the specified treatment program. If that were all that was at stake, we could probably not say that a liberty interest had been created, given the fact that prisons frequently maintain treatment and behavioral modification programs (such as anger management or alcohol abuse classes) that have long withstood legal challenge."); Love v. McKune, 33 Fed.Appx. 369 (10th Cir. 2002);[4] Barkus

_____

[4] In Love v. McKune, the Court held that requiring involuntary participation in a behavior modification program described below, did not violate due process:

The "involuntary behavior modification system" referred to is Internal Management

8

v. Kaiser, 229 F.3d 1162 (Table), 2000 WL 1346226 (10th Cir. 2000) (unpublished) (inmate's thirty-three day placement in behavior modification program [i.e., carrot and stick approach] that restricted his television and movement privileges did not impose significant hardship on inmate sufficient to create a liberty interest); Jones 'El v. Berge, No. 00-C-421-C, 2001 WL 34379611, at *16 (W.D.Wis. Aug. 14, 2001) (holding that the plaintiffs in a class action on behalf of inmates at the Wisconsin supermax prison failed to state a claim for violations of their procedural due process rights, notwithstanding allegations that "the solitary confinement, denial of privileges, additional regulations and restrictions on protected and discretionary activities, the limitation on educational and employment opportunities, the lack of access to legal materials and legal counsel and the behavior modification program at Supermax impose an atypical and significant hardship on plaintiffs in relation to the ordinary incidents of prison life in the Wisconsin prison system .... [P]risoners do not have a liberty interest in remaining out of segregation status so long as that period of confinement does not exceed the remaining term of

_____

Policy and Procedure (IMPP) 11-101, adopted by the Kansas Department of Corrections in January 1996. "IMPP 11-101 implements a statewide incentive level system which ties inmate privileges to participation in programs and good behavior." *Pool v. McKune*, 267 Kan. 797, 987 P.2d 1073, 1076 (Kan.1999). Under the system, incarcerated inmates are assigned to one of four levels (Intake Level through Level III) and, in turn, are provided with a corresponding level of privileges (e.g., television ownership, handicrafts, participation in organizations, use of outside funds, canteen expenditures, incentive pay, visitation). In order to be assigned to a higher level and obtain more privileges, inmates must "generally remain[ ] free of offenses and demonstrat[e] a willingness to participate in recommended programs." *Stansbury v. Hannigan*, 265 Kan. 404, 960 P.2d 227, 230 (Kan.1998). An inmate may be assigned to a lower level, and in turn lose privileges, for a variety of reasons, including commission of disciplinary offenses or refusal to participate in a recommended program. Id., 960 P.2d at 237.

Id. at 370.

their incarceration.").[5] Accordingly, Plaintiff has no liberty interest, as a matter of law, arising directly from the Due Process clause that prevents his placement in the SMU[6] and/or the LTSU. Hence, the only other source of a liberty interest could arise from state law.

Addressing the issue of state created liberty interests, the United States Supreme Court in Sandin v. Conner, 515 U.S. 472, 484 (1995) made a sea change in the analysis courts had used prior to the Sandin decision. Prior to Sandin, the courts were instructed to determine whether the State had issued regulations or rules and whether in those promulgations the State had used "language of an unmistakably mandatory character" such that the incursion on liberty would not occur "absent specified substantive predicates." Hewitt v. Helms, 459 U.S. 460, 471 -72. (1983). However, in Sandin, that methodology was rejected. Sandin, 515 U.S. at 483-84 n.5.[7] In Sandin

---

[5] The specific holding of Jones 'El v. Berge with respect to there being no liberty interest implicated by a transfer to a super max prison may be suspect in light of the subsequent Supreme Court decision in Wilkinson v. Austin, 545 U.S. 209 (2005) but it continues to be persuasive authority for the proposition that mere behavior modification such as the carrot and stick approach, which necessarily excludes use of psychiatric treatment, does not implicate a liberty interest.

[6] Unlike with the LTSU, Plaintiff points to no evidence that the SMU utilizes behavior modification. Nevertheless, the very nature of the program permits a reasonable inference that the SMU does do so. Even so, again the behavior modification utilized in the SMU is the same as that in the LTSU, a carrot and stick approach with respect to increasing and decreasing privileges. Such does not implicate a liberty interest created by the Due Process clause.

[7] Despite this rejection of the Hewitt methodology, Plaintiff appears to continue to rely thereon in his arguments, asserting that state regulations and rules gave him a liberty interest apparently in having certain state mandated procedures followed. See, e.g., Dkt. [71] at 6 (invoking Prison Policy 2.1.2 and 45 Pa.C.S.A. §§ 1201-0821) and at 21 (invoking 37 Pa. Code 93.10 and 93.11(b)). However, the Court of Appeals for the Third Circuit has specifically rejected this notion. As the Court of Appeals for the Third Circuit explained:

The fact that Pennsylvania regulations provide for hearings after transfer to administrative custody is not relevant to a determination of whether federal procedural due process is required. See Hewitt v. Helms, 459 U.S. 460, 470 (1983)(The mere fact that Pennsylvania has created a careful procedural structure to regulate the use of administrative segregation does not indicate the existence of a protected liberty interest.). The process afforded by state law is not relevant in determining whether there is a state

the Supreme Court "abrogated the methodology of parsing the language of particular regulations." <u>Wilkinson</u>, 545 U.S. at 222-23. (describing the Court's holding in <u>Sandin</u> ). "After <u>Sandin</u>, it is clear that the touchstone of the inquiry into the existence of a protected, state-created liberty interest in avoiding restrictive conditions of confinement is not the language of regulations regarding those conditions." <u>Id</u>. at 223 (<u>quoting</u> <u>Sandin</u>, 515 U.S. at 484).

Rather than searching state prison regulations or laws for mandatory language, the <u>Sandin</u> court directed that we are to analyze the nature of the deprivation to determine if a liberty interest is implicated. Specifically, the <u>Sandin</u> Court held that a state government "may under certain circumstances create liberty interests which are protected by the Due Process Clause. But these interests will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force, nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." 515 U.S. at 483. The meaning of these words or this test is not self evident. <u>Skinner v. Cunningham</u>, 430 F.3d 483 (1st Cir. 2005)("The hardship test has itself become the source of major disagreement."). The test apparently requires a determination

---

created right that triggers due process protection. *Olim v. Wakinekona*, 461 U.S. 238 (1983). ("The State may choose to require procedures for reasons other than protection against deprivation of substantive rights, of course, but in making that choice, the State does not create an independent substantive right.")

<u>Griffin v. Vaughn</u>, 112 F.3d 703, 709 n.3 (3d Cir. 1997). Not only does the State's creation of procedures before a certain deprivation can occur, fail to establish that Plaintiff has a liberty interest in what he was deprived of, but in addition, Plaintiff has no constitutional liberty interest in the Defendants following the procedures allegedly mandated by state law. <u>River Park, Inc. v. City of Highland Park</u>, 23 F.3d 164, 166 (7th Cir. 1994) ("the Constitution does not require state and local governments to adhere to their procedural promises"); <u>Wilson v. Formigoni</u>, 42 F.3d 1060, 1066 (7th Cir. 1994) ("[S]tate-created procedural requirements do not, standing alone, constitute protected liberty or property interests or create substantive entitlements.") (citations omitted). Hence, neither the deprivation nor the failure to follow state mandated procedures deprive Plaintiff of a liberty interest here.

of what constitutes the ordinary incidents of prison life, which has been referred to as the "baseline" or "base for comparison,"[8] so as to determine whether a particular deprivation can be said to be atypical and significant.  See, e.g., Wilkinson v. Austin, 545 U.S. at 223 ("In *Sandin's* wake the Courts of Appeals have not reached consistent conclusions for identifying the baseline from which to measure what is atypical and significant in any particular prison system. This divergence indicates the difficulty of locating the appropriate baseline, an issue that was not explored at length in the briefs.").   Rather than resolve this question, the Supreme Court provided no guidance by refusing to do so.  Id. ("We need not resolve the issue here, however, for we are satisfied that assignment to OSP imposes an atypical and significant hardship under any plausible baseline.").[9]  Hence, as of June 13, 2005, the date Wilkinson was decided, it is unclear from the Supreme Court what the baseline of comparison is to be under Sandin, and consequently how to determine a liberty interest under Sandin, nearly more than ten years after Sandin was decided.

The Court of Appeals for the Third Circuit has provided some guidance regarding this issue. Among the first attempts to address this issue, the Court of Appeals stated that "the

---

[8] Sealey v. Giltner, 197 F.3d 578, (2d Cir. 1999)("The District of Columbia Circuit uses the 'most restrictive' conditions of administrative confinement as the base for comparison. . . .").

[9] Although not wishing to establish a baseline, the Court appeared to necessarily exclude one potential baseline by implication.  Whereas Mechum seemed to establish that a prisoner has no liberty interest to be housed in any prison in the state, including the most secure one in the state, Meachum v. Fano, 427 U.S. 215, 225 (1976)(no liberty interest arising from Due Process Clause itself in transfer from low to maximum security prison, because confinement in any state institution is within normal limits or range of custody which the conviction has authorized the state to impose), Wilkinson seems to overrule that insofar as Ohio prisoners apparently had a liberty interest  not to be housed in the supermax prison without some  procedural due process protections.  Hence, by implication, it appears that the baseline for Sandin's test of atypicality, at least in Ohio and perhaps elsewhere, cannot be the conditions of the  most secure prison in the state.

baseline for determining what is 'atypical and significant'-the 'ordinary incidents of prison life'-is ascertained by what a sentenced inmate may reasonably expect to encounter as a result of his or her conviction in accordance with due process of law." Griffin v. Vaughn, 112 F.3d 703, 706 & n. 2 (3d Cir. 1997). Unfortunately, there are several difficulties with this formulation. One may be that it is tautological. Defining a liberty interest for purposes of determining whether certain procedures are constitutionally required by saying that a deprivation does not constitute a liberty interest if it constitutes a deprivation that a prisoner may reasonably expect in accordance with due process of law appears to be a tautology, i.e., defining a word by using that same word or a form of the same word.[10] Even if not tautological, what is apparently required or permitted by such a formulation is quite open ended and provides little practical guidance. However, even if the formulation does not, the precise holding of Griffin perhaps provides more guidance; from Griffin we know that a prisoner placed in the conditions of Administrative Custody for a period of 15 months does not implicate a liberty interest. See id.[11]

_____

[10]  The formulation may not be a tautology if the formulation means in accordance with "substantive due process" i.e., in accordance with fundamental fairness as opposed to "procedural due process."

[11]  The Circuit Court's other statements on this issue have varied. Compare Leamer v. Fauver, 288 F.3d 532, 546 (3d Cir.  2002)("under Sandin a court must assess whether administrative segregation, or its concomitant conditions, constitute an 'atypical and significant hardship' by comparing the circumstances of Leamer's placement with those of others within comparable confinement."); Shoats v. Horn, 213 F.3d 140, 144 (3d Cir. 2000)(in determining what constitutes an atypical and significant hardship for those in disciplinary confinement, the question is "whether the conditions of his confinement in disciplinary segregation were significantly more restrictive than those imposed upon other inmates in solitary confinement."). Griffin v. Vaughn, 112 F.3d 703, 708 (3d Cir. 1997)("It is thus apparent that in the penal system to which Griffin was committed with due process of law, it is not extraordinary for inmates in a myriad of circumstances to find themselves exposed to the conditions to which Griffin was subjected."). Griffin appears to reject that assertion that the base of comparison is with the conditions of the inmates in the general population of the single prison where the prisoner-plaintiff's deprivation took place. Id., at 706 n.2.

Perhaps as a consequence of the fluidity of the test for atypicality, the Court of Appeals has also emphasized that this is a fact intensive inquiry. Wilkins v. Bittenbender, __ Fed.Appx. __, 2007 WL 708993, *2 (3d Cir. 2007)("In order to do so [i.e., determine whether a deprivation is atypical and significant], a court should perform a fact-specific inquiry evaluating 'the duration of disciplinary confinement and the conditions of that confinement in relation to other prison conditions.'")(quoting Mitchell v. Horn, 318 F.3d 523, 531 (3d Cir. 2003)).

Significantly, for purposes of deciding this motion for summary judgment, it is a Plaintiff's burden to establish the existence of a liberty interest. Zigmund v. Foster, 106 F.Supp.2d 352, 360 (D. Conn. 2000)("The plaintiff bears the burden of demonstrating the existence and infringement of a protected liberty or property interest."). Hence, it is Plaintiff's burden to adduce evidence that the conditions he faced were both atypical and significant hardships in relation to the ordinary incidents of prison life. Frazier v. Coughlin, 81 F.3d 313, 317 (2d Cir. 1996)("To prevail, Frazier must establish . . . that the confinement or restraint creates an 'atypical and significant hardship' under *Sandin*"); Vasquez v. Coughlin, 2 F.Supp.2d 255, 260 (N.D.N.Y. 1998)("Plaintiff has the burden of proving that the conditions of his confinement constituted an atypical, significant hardship in relation to the ordinary incidents of prison life in order to recover damages under 42 U.S.C. section 1983."); Keel v. Dovey, 459 F.Supp.2d 946, 955 (C.D.Cal. 2006)("Plaintiff has failed to carry her burden of raising a triable issue of material fact on whether her placement in Ad Seg qualifies as an 'atypical and significant hardship[ ]... when compared to the burdens of ordinary prison life' ")(some internal quotation marks omitted). Accord Wilkins v. Bittenbender, __ Fed.Appx. __ , 2007 WL 708993 at *2 (3d Cir. 2007)("Nor has he [i.e., the prisoner-plaintiff] provided any evidence that the

conditions during his stay in administrative segregation involved atypical or significant hardship.").

Instantly, although Plaintiff offered evidence of the type of deprivations he encountered in the SMU and the LTSU, he has offered no evidence at all with respect to the atypicality of the hardships that he suffers.[12] However, without a base of comparison, there is no evidence to establish the atypicality of the hardships. Indeed, there is support in the record to indicate that the conditions plaintiff ascribes to the LTSU are identical to the conditions under which plaintiff was previously housed in the SMU at SCI-Greene and, furthermore, that those conditions are not significantly different from conditions in the RHU, which could constitute some evidence that the conditions of the LTSU and/or SMU are not so atypical as to come within Sandin's protections. Dkt. [71] at 17"(both the LTSU and SMU are no more secure than an RHU in a normal L-5 unit. As is determined from (Exhibit 7 p.3) neither unit offers anything that is not offered in the RHU."). Indeed, Plaintiff has provided no evidence of the frequency with which prisoners face restrictions/deprivations similar to the restrictions/deprivations of the SMU and or the LTSU nor, in the case of the SMU, any evidence of the numbers of prisoners who face such restrictions/ deprivations. In fact, under the reasoning of Shoats v. Horn, in order to succeed, it appears that Plaintiff must show that his conditions were harsher than the conditions of others throughout Pennsylvania's correctional facilities who are in solitary confinement. Shoats v. Horn,

---

[12] He did offer evidence of the small numbers of prisoners who are are placed in the LTSU, at any one given time, at least with respect to the number of prisoners placed in the LTSU at SCI-Fayette. Dkt. [70-11] at 2, ("Only one-tenth of 1 percent of the state's 40,000 inmates live in the LTSU cells at the new State Correctional institution-Fayette, in Luzerne County. . ."). However, even if there is only a small number of prisoners who actually live in the special program called the LTSU, absent evidence that the conditions in the program are radically different from the conditions in, say, for example, the Administrative Custody, and Plaintiff fails to point to such evidence, Plaintiff has failed to establish the atypicality of the conditions of the LTSU and hence that he was deprived of a liberty interest.

213 F.3d 140, 144 (3d Cir. 2000)(in determining what constitutes an atypical and significant hardship for those in disciplinary confinement, the question is "whether the conditions of his confinement in disciplinary segregation were significantly more restrictive than those imposed upon other inmates in solitary confinement."). See also Wagner v. Hanks, 128 F.3d 1173 (7th Cir. 1997)(State prison inmate's due process claim based on inmate's placement in disciplinary segregation was to be evaluated by comparing conditions of inmate's confinement with conditions of segregation in state's entire prison system, not just inmate's individual prison.). Because Plaintiff offers no evidence that his conditions in the SMU and/or the  LTSU were "significantly more restrictive than those imposed upon other inmates in solitary confinement" pursuant to Shoats or any evidence as to the likelihood and frequency and duration of stays in conditions like those of the LTSU were visited upon other prisoners, Plaintiff has failed to establish that the conditions he faces are an atypical and significant hardship.  Thus, Plaintiff has failed to establish by evidence that he has been deprived of a liberty interest at all.

Furthermore, the court takes judicial notice that the conditions of the SMU and LTSU do not appear to be significantly different from those found in the AC as described in Griffin v. Vaughn.

Nor do Plaintiff's allegations of other inmates throwing feces and bodily fluids in the SMU and/or LTSU establish atypicality in the absence of information concerning the frequency of exposure of other inmates in solitary confinement or even in general population to these conditions.  The same holds true of Plaintiff's complaints about being exposed to inmates who allegedly were mentally ill that were housed in the LTSU or SMU.   As such, Plaintiff has failed to establish the deprivation of a liberty interest.

16

Alternatively, even if Plaintiff did establish a genuine issue of material fact with respect to the existence of a liberty interest, he has failed to show that the process that he did receive in connection with his being deprived of being in general population or being deprived of being in the RHU was constitutionally inadequate.

The Defendants adduced evidence of all of the process he received. Namely, Plaintiff received many misconducts between July 1999, the date whereon Plaintiff entered into DOC's custody and in or about December 2001, when Plaintiff was recommended for placement in the SMU. Plaintiff was not transferred to the SMU until February 19, 2002. Dkt. [57] at 8 to 9. It is undisputed that Plaintiff received notice and an opportunity to be heard regarding the multiple disciplinary charges most of which he was found guilty of.

Furthermore, it is undisputed that Plaintiff was transferred to the SMU on February 19, 2002, Dkt. [56-2] at 31, and that less than three full days later, on February 22, 2002, Plaintiff was given an opportunity to meet with a SMU Review team, where he was specifically informed of the way in which to progress through the SMU and ultimately gain release to the general population and was provided an opportunity to be heard by them. Dkt. [56-2] at 31. He received thirty day reviews thereafter wherein his status was reviewed to determine his progress and whether he should be promoted to higher levels of privileges. In fact, several times he was so promoted but because of his subsequent behavior, he was repeatedly demoted. After several such demotions, Plaintiff was transferred back to the RHU on March 24, 2004, for failure to successfully complete the SMU. Dkt. [57] at 10. In addition, during his stay in the SMU, Plaintiff also received reviews every 60 days by the PRC, Dkt. [56-3] at 2 to 19, to which he was invited to attend and be heard. This is sufficient process so as to satisfy the procedural due

process clause.  See, e.g., Shoats v. Horn, 213 F.3d 140, 144 (3d Cir.2000) (periodic reviews by PRC of placement in Administrative Custody for 8 years satisfied due process).[13]

After Plaintiff was transferred back to the RHU based on his failure in the SMU, the process to have Plaintiff transferred to the LTSU was begun almost immediately, Dkt. [56-3] at 35 to 38.  On January 4, 2005, Plaintiff was given notice that "you have been received from SCI-Greene as an administrative transfer for placement into the Long Term Segregation Unit.  You currently are on Administrative Custody and will be placed on LTSU Level 4 for a 90 day assessment, you will remain housed in the LTSU at SCI-Fayette until completion of the program."  Dkt. [56-3] at 26.  The notice specifically referenced DC-ADM 802 Article VI., Section A,subsection 1a.[14]  Because there was no room for Plaintiff in the LTSU, he was put on a waiting list, Dkt. [56-3] at 38, and was not formally placed in the LTSU until January 4, 2005.  Dkt. [57] at 12. Once there, the following day, he met with the PRC for his initial review.  Dkt.

---

[13]  Plaintiff does aver that he was not allowed to attend his annual review nor permitted to appeal it.  Dkt. [70-15].  Even if this is true, it does not establish that he was denied procedural due process in light of the other process he received which the record establishes, such as the PRC reviews and 30 day unit reviews, even if, as Plaintiff contends, he did not receive copies of the written decisions from the 30 day unit reviews.  Nor does procedural due process require that Plaintiff be able to appeal from a 30 day unit review.

[14]  The Court takes judicial notice of the fact that  DC-ADM 802 Article VI., Section A,subsection 1a (issued March 8, 2004), provided at that time as follows:

VI.  PROCEDURES
    A.  Reasons for transfer to Administrative Custody
        1.  An inmate may be transferred from general
        population to Administrative Custody by order of the
        shift commander for the following reasons(s):
                a. The inmate is a danger to some person(s) in
                the institution who cannot be protected by
                alternate measures

[56-3] at 10, and the PRC recorded the following on the PRC review sheet: "He was told by the committee that he needs to comply with rules and regulations of the LTSU program. He is now in the assessment phase. He was told to get no misconducts, keep his cell clean, show up for his 30-day reviews, be respectful to staff and he will get through the program. His next 90-day review is scheduled for 03/30/05." Id. It is undisputed that he received these 60 or 90 day reviews until January 2, 2007 when the LTSU was transitioned in to an SMU because DOC phased out the LTSU. The procedures the Defendants point to establish that, assuming Plaintiff was deprived of a liberty interest by his placement in the SMU from February 22, 2002 until to March 24, 2004, and/or in the LTSU from January 2, 2005 until January 2, 2007, such "deprivations" were not accomplished without the process required by the procedural due process requirements of the Constitution.[15]

---

[15] This is true notwithstanding that Plaintiff avers that "I was never informed of why I was being put in the LTSU." Dkt. [70-2] at 2, ¶9, because in the second sentence thereafter, Plaintiff acknowledges that "As with the SMU, the LTSU did not tell me why I was housed there **other than my alleged behavior**, with nothing written." Id., at ¶11 (emphasis added). Plaintiff was given notice of the reason for his placement in both the SMU and the LTSU, i.e., his behavior. Morever, it is apparent from Plaintiff's own evidence, that he did receive written copies of his PRC reviews. Dkt. [70-16] at 4 (Plaintiff's Inmate Request to Staff wherein Plaintiff wants to know "why on my PRC sheet" a person named Galluci appears). In addition, despite Plaintiff's averment that "before **or after** being placed in said unit [i.e. SMU], Plaintiff was never given any notice, chance to be heard or appeal such placement" Dkt. [70-2] at 2, ¶5, the documentary evidence indicates that Plaintiff received 30 day reviews by the unit team, Dkt. [56-2] at 31 to 59 and Plaintiff's own evidence establishes that at least in the LTSU, Plaintiff attended these 30 day reviews. Dkt. [70-24] at 2. Such conclusory allegations in Plaintiff's affidavits, without more, in the face of such documentary evidence, are insufficient to create a genuine issue of material fact See, e.g., Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 888 (1990) (the non-moving party may not defeat a properly supported summary judgment motion by simply substituting the "conclusory allegations of the complaint or answer with conclusory allegations of an affidavit."); Seddon v. Maytag Corp., No. 04-CV-4058, 2005 WL 2030629, *3 (S.D.Ill. Aug. 23, 2005)("The Court will not credit a self-serving and contradictory affidavit that is clearly and inherently inconsistent with documentary evidence presented by the same party."); Matter of Bevill, Bresler & Schulman, Inc., 94 B.R. 817, 822 n.4 (D.N.J. 1989)("While on summary judgment Hawthorne is entitled to all reasonable inferences from the facts it alleges, Herbst's allegations here have been contradicted by documentary evidence and therefore cannot be accepted as true.").

To the extent that Plaintiff complains that he was required to have received pre-deprivation notice and an opportunity to be heard, i.e., he was required by procedural due process to received notice that he was being placed in the LTSU before actually being placed therein and an opportunity to be heard prior to being placed therein, Plaintiff is mistaken.[16]  Assuming that he was required by procedural due process to be given notice and an opportunity to be heard prior to being deprived of a liberty interest, he would be required to show when he was deprived of a liberty interest so as to enable us to determine when the pre-deprivation process was required. Knowing as we do that 15 months in AC did not deprive a prisoner of a liberty interest, pursuant to Griffin v. Vaughn, and knowing that the conditions of the AC are not dramatically different from those of the LTSU, the fact that Plaintiff was in the LTSU for only one day, i.e., from January 4, 2005 to January 5, 2005, when Plaintiff met with the PRC who gave him notice of the reasons for his being placed in the LTSU and an opportunity to be heard, we hold as a matter of law that such a short duration of exposure to the conditions of the LTSU did not deprive him of a liberty interest and hence, he did in fact receive notice and an opportunity to be heard **prior** to the deprivation of any liberty interest.   At best, Plaintiff might be able to show that after a greater length of time, for example, 15 months *a la* Griffin, in the LTSU he was deprived of a liberty interest, but prior to that time, he had received much process and several explanations of why he was initially placed there and continued there and given several opportunities to be heard as to those explanations.  This is sufficient.  Hence, Plaintiff has failed to show that even if he were

---

[16]  See, e.g., Dkt. [71] at 22 ("Plaintiff was not given notice or reason for transfer[ to the LTSU.] I was not given [a] chance to be heard except after placement, which surely violated Plaintiff's due process rights."); Dkt. [70-18] at 3.

deprived of a liberty interest at some point in time after being in the LTSU, such was not accomplished without the procedures required by procedural due process.[17]

This is true notwithstanding Plaintiff's complaints that the process was perfunctory given that, just as in the process he received while in the SMU, the process actually worked to provide Plaintiff with approvals for greater privileges only to have those privileges again removed upon Plaintiff's subsequent failures to comply with prison rules.

Accordingly, on this record no reasonable jury could find for the Plaintiff on his procedural due process claim.

### 2. Equal Protection

The Equal Protection Clause of the Fourteenth Amendment provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. Amend. XIV, § 1. In order to establish an equal protection claim, plaintiff must show that: (1) the person, compared with others similarly situated, was selectively treated, and (2) the selective treatment was motivated by an intention to discriminate on the basis of impermissible considerations, such as race or religion, to punish or inhibit the exercise of constitutional rights, or by a malicious or bad faith intent to injure the person. See Zahra v. Town of Southold, 48 F.3d 674, 683 (2d Cir. 1995). Essentially, to demonstrate an equal protection violation, an inmate has the burden of proving under the second prong the existence of purposeful

---

[17] Thus the fact that DOC may have subsequently amended its procedures to provide notice and an opportunity to be heard prior to transfer to the LTSU, does not mean that Plaintiff's transfer to the LTSU without such pre-transfer notice violated his due process rights especially in light of the fact that Plaintiff was not deprived of any liberty interest when he was actually given notice and an opportunity to be heard within one day after being transferred into the LTSU, a time so short that no liberty interest could conceivably have been deprived. The same may be said of his placement in the SMU, wherein less than 3 days after his placement there, the SMU Unit team met with him.

discrimination.  Hernandez v. New York, 500 U.S. 352 (1991); McCleskey v. Kemp, 481 U.S. 279, 292 (1987).  Official action does not violate the Equal Protection Clause solely because it results in a disproportionate impact; proof of discriminatory intent or purpose is required to show a violation.  Village of Arlington Heights v. Metropolitan Housing Development Corp., 429 U.S. 252, 265 (1977); Washington v. Davis, 426 U.S. 229, 239 (1977);  Stehney v. Perry, 101 F.3d 925, 938 (3d Cir. 1996). Discriminatory purpose implies more than intent as volition or intent as awareness of consequences; it implies that the decision maker selected a particular course of action at least in part because of, not merely in spite of, its adverse effects upon an identifiable group.  Hernandez, 500 U.S. at 360.

Here, the Defendants have pointed out that the record lacks evidence that the white individuals to whom Plaintiff points are similarly situated to him .  Dkt. [57] at 18 to 23.  The Defendants are correct and Plaintiff has failed to carry his burden to show that the white inmates and black inmates were similarly situated.  For example, the Defendants have established that at least two of the four white prisoners Plaintiff points to were never even in the LTSU or SMU and that another white inmate was transferred out of the LTSU only after having spent nearly four years and five months there, which is three years longer than Plaintiff spent in the LTSU and, furthermore, Defendants note that this white inmate was released from the LTSU only after having gone nine months without a misconduct charge.

In addition, this court notes that at best, Plaintiff's arguments seek to establish that simply because there appears to be some disparate impact occurring, i.e., black inmates are not released from the LTSU as frequently or as quickly as white inmates, then equal protection is denied, i.e., there is intentional racial discrimination .  However, the facts that Plaintiff points to at most

would establish disparate impact and, without more, (and indeed, Plaintiff has pointed to nothing more in the record), Plaintiff's equal protection claim fails because there is no evidence to show that the decision maker selected a particular course of action at least in part because of, not merely in spite of, its adverse effects upon an identifiable group. Accordingly, the Defendants are entitled to summary judgment on the equal protection claim.

### 3. Eighth Amendment

Plaintiff complains that his Eighth Amendment rights are being violated by the conditions of the SMU and/or the LTSU because, inter alia, fellow inmates throw feces and flood their cells with dirty toilet water. Defendants contend that Plaintiff has failed to adduce evidence to support the objective prong of an Eighth Amendment claim.

The Eighth Amendment provides that "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." The Supreme Court has explained that analysis of a violation of the Eighth Amendment involves a two pronged inquiry: 1) an objective inquiry into the qualitative nature of the harm suffered by the victim of the alleged punishment and 2) a "subjective inquiry" into the mind of the person inflicting the harm. See Wilson v. Seiter, 501 U.S. 294 (1991). Accord Sims v. Artuz, 230 F.3d 14, 21 (2d Cir. 2000) ("A claim of cruel and unusual punishment in violation of the Eighth Amendment has two components–one subjective, focusing on the defendant's motive for his conduct, and the other objective, focusing on the conduct's effect.") (*citing* Hudson v. McMillian, 503 U.S. 1, 7-8, (1992)). The Court of Appeals for the Third Circuit has explained the objective element as requiring proof that "the deprivation was sufficiently serious to fall within the Eighth Amendment's zone of protections.... If not our inquiry is at an end." Fuentes v. Wagner, 206

F.3d 335, 344 (3d Cir. 2000), <u>cert</u>. <u>denied</u>, 531 U.S. 821 (2000) (citations omitted). Only if the harm suffered is sufficiently serious does the court then turn to analyze the subjective element which the Third Circuit has described as determining whether the prison "officials acted with a sufficiently culpable state of mind. In other words, we must determine if they were motivated by a desire to inflict unnecessary and wanton pain." <u>Id</u>. (citations omitted).

Although the "objective component of a cruel-and-unusual-punishment claim focuses on the harm done." <u>Sims v. Artuz</u>, 230 F.3d at 21, the Third Circuit has cautioned that "not every governmental action affecting the interests or well-being of a prisoner is subject to Eighth Amendment scrutiny." <u>Fuentes v. Wagner</u>, 206 F.3d at 344 (quoting <u>Whitley v. Albers</u>, 475 U.S. 312, 319 (1986)) (internal quotes omitted). In determining whether a harm "was sufficiently serious to fall within the Eighth Amendment's zone of protections", <u>Fuentes v. Wagner</u>, 206 F.3d at 344, the Third Circuit has described the inquiry as whether the prisoner has been deprived of the "minimal civilized measure of life's necessities." <u>Young v. Quinlan</u>, 960 F.2d 351, 359 (3d Cir. 1992), <u>superseded</u> <u>by</u> <u>statute</u> <u>on</u> <u>other</u> <u>grounds</u>, (quoting <u>Rhodes v. Chapman</u>, 452 U.S. 337, 347 (1981)). Proving that one has been deprived of the minimal civilized measure of life's necessities requires proof that one has been denied "basic human needs, such as food, clothing, shelter, sanitation, medical care and personal safety" from physical assault. <u>Griffin v. Vaughn</u>, 112 F.3d at 709.

Turning to the subjective component, the Supreme Court has held that "deliberate indifference to serious . . . needs of prisoners constitutes the unnecessary and wanton infliction of pain ... proscribed by the Eighth Amendment." <u>Estelle v. Gamble</u>, 429 U.S. 97, 104 (1976) (internal quotations omitted). The Court has held that "deliberate indifference" occurs when a

prison "official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists and he must also draw the inference." Farmer v. Brennan, 511 U.S. 825, 837 (1994). As a corollary of the deliberate indifference standard, mere negligence by prison staff and officials is not sufficient to state an Eighth Amendment violation. Estelle, 429 U.S. at 105-06.

Plaintiff complains about conditions of his confinement while in the LTSU, alleging that there were mentally ill inmates housed therein who make excessive noise and that some of the inmates smeared their feces in the cells and that they threw feces as well as bodily fluids around. Plaintiff also notes that LTSU inmates are required to change cells every thirty days in the LTSU and that this requires him to go into cells where bodily excretions have been thrown around. Plaintiff alleges that such conditions violated the Eighth Amendment.

The difficulty with these allegations and evidence is that Plaintiff fails to adduce evidence of the length of exposure to some of these conditions, such as for example, how long the bodily excretions are permitted to remain until they are cleaned. Certainly length of exposure to unsanitary conditions is one consideration in determining the objective prong of the Eighth amendment. Davis v. Scott, 157 F.3d 1003, 1004 (5th Cir. 1998)(inmate being placed in cell that was "just filthy with blood on the walls and excretion on the floors and bread loaf on the floor" for three days did not meet the objective component of the Eighth Amendment)(some internal quotes omitted); Whitnack v. Douglas County, 16 F.3d 954, 958 (8th Cir. 1994)("the intolerable conditions lasted not more than 24 hours before the availability of adequate cleaning supplies would make them tolerable."); Banks v. Beard, 2006 WL 2192015, *11 (W.D.Pa. Aug. 1, 2006)

("he does not allege that any particular unsanitary conditions remained for an inordinate period of time. Accordingly, Plaintiff has failed to raise conditions that will satisfy the objective component of an Eighth Amendment claim."); Qawi v. Howard, 2000 WL 1010281, *3 (D.Del. July 7, 2000)("For example, in [*Smith v.*] *Copeland* [, 87 F.3d 265, 268 (8 Cir.1996) ], the Eighth Circuit Court of Appeals held that an inmate's confinement in a cell for four days with an overflowing toilet, during which time he was 'made to endure the stench of [his] own feces and urine,' did not rise to the level of an Eighth Amendment violation."). Given the absence of any evidence regarding the length of time that exposure to these conditions lasts, it does not appear that Plaintiff satisfies the requirement that he produce evidence supporting the objective component of the Eighth Amendment. See Hutto v. Finney, 437 U.S. 678, 687 (1978) (noting that unpleasant conditions of confinement "might be tolerable for a few days and intolerably cruel for weeks and months").

Furthermore, in the LTSU, a place for the worst of the worst, it is not possible to control such random inmate behavior fully, hence, the only thing possible is for the Defendants to remediate these conditions after they have occurred. Plaintiff adduces no evidence that these conditions are not remediated, or if not remediated in a timely manner that the Defendants had actual knowledge that such conditions were not remediated in a timely manner. Thus, Plaintiff fails to establish the subjective prong of his Eighth Amendment claim.

As such, the Defendants are entitled to summary judgment on this record.

### 4. Qualified Immunity

Although the Court has concluded that Plaintiff has failed to establish any violation of his constitutional rights, because we cannot know whether a higher court will disagree as to this

conclusion, we reach the issue of qualified immunity as an alternative basis, in light of the

Defendants' invocation of this defense.[18]

The Moving Defendants have invoked the qualified immunity defense.  The Court of

Appeals

> has explained that a qualified immunity analysis must begin with this
> threshold question: do the facts alleged, viewed in the light most favorable to the
> party asserting the injury, show that the officer's conduct violated a constitutional
> right? *Saucier* [*v. Katz*, 533 U.S. 194, 201 (2001)].  If the plaintiff fails to allege
> the violation of a constitutional right, no further inquiry is necessary. If, however,
> the alleged facts show that there was a constitutional violation, then the next step
> is to ask whether the right was clearly established. *See id*. In other words, a court
> must consider "whether it would be clear to a reasonable officer that his conduct
> was unlawful in the situation he confronted." *Id. (citing Wilson v. Layne*, 526 U.S.
> 603, 615 (1999)). This inquiry, the Court noted, "must be undertaken in light of
> the specific context of the case, not as a broad general proposition." *Id*. If a court
> concludes that an officer's conduct did violate a clearly established constitutional
> right, then it must deny him the protection afforded by qualified immunity.

Curley v. Klem, 298 F.3d 271, 277 (3d Cir. 2002), *abrogation on other grounds recognized in*,

Curley v. Klem, 499 F.3d 199 (3d Cir. 2007).

Given the confusing state of the law with respect to liberty interests and the baseline of

comparison and the fact that we must consider atypicality on such a fact sensitive inquiry which

includes the duration of the deprivation and the fact that the Defendants surely did not know at

the time that they placed Plaintiff in either the SMU and/or the LTSU how long he would be in

---

[18]   The Complaint seeks not only money damages but also injunctive relief. To the extent that a
higher court would find an actual violation of the Constitution, the defense of immunity would only
apply to the damages claim and not to prospective injunctive relief.  Morse v. Frederick, 127 S.Ct. 2618,
2642 (2007)(Breyer, J., concurring)("A 'qualified immunity' defense applies in respect to damages
actions, but not to injunctive relief.").  Since the LTSU has been eliminated, the injunctive relief would
only be applicable to Plaintiff's placement in the SMU, where he is apparently currently being housed.

there[19] it would not have been clear to a reasonable official in the Defendants' position that Plaintiff was entitled to any pre-deprivation, or more properly, a pre-placement hearing. Nor would it have been clear to a reasonable official that the process which they did afford Plaintiff was constitutionally inadequate.[20] Accordingly, they are entitled to qualified immunity for the procedural due process claim.

Similarly, given the facts as alleged, and the evidence adduced, even if a higher court determines that the Defendants violated the equal protection clause, it would not have been clear to reasonable defendants that the adverse actions taken against the black inmates and the allegedly positive actions taken toward the white inmates violated the equal protection clause of the Constitution where officials in the shoes of the Defendants could have reasonably believed that the inmates pointed to by Plaintiff were not similarly situated so as to require similar treatment especially in light of the evidence of record.[21]

---

[19] Plaintiff's own evidence establishes this. See, e.g., Dkt. [70-10] at 4 ("The [LTSU] program is designed to last up to 36 months, but we have had inmates who have been in it less and inmates who've been in it longer[.]").

[20] To the extent that Plaintiff attempts to rely on Bronson v. Horn, No. 3:01-CV-26 (M.D. Pa.) for the proposition that the law was clearly established that a prisoner is entitled to due process protections prior to placement in the LTSU or the SMU, Dkt. [71] at 8, the court is not convinced. Assuming that an unpublished District Court case is sufficient to satisfy "clearly established law," but see Anderson v. Romero, 72 F.3d 518, 525 (7th Cir. 1995)("But we agree with the Second Circuit that district court decisions cannot clearly establish a constitutional right."), the single unpublished memorandum that held due process requires a hearing prior to placement in the LTSU was not rendered until August 16/17, 2005. See id. (Dkt. 350)(Available on PACER). At best, this memorandum could establish entitlement to a hearing prior to placement in the LTSU. However, Plaintiff had already been placed in the LTSU without a pre-placement hearing on January 4, 2005, some eight months earlier. So it was not clearly established at the time of Plaintiff's placement that he was entitled to any process prior to placement in the LTSU. Morever as the memorandum addressed only the LTSU, it established no law with respect to the SMU.

[21] For an analysis of the interplay between constitutional torts requiring a state of mind showing, such as equal protection requiring intentional discrimination and the doctrine of qualified immunity, see Auriemma v. Rice, 910 F.2d 1449, 1452 (7th Cir. 1990) (en banc) ("The objective determination in these

Lastly, the Defendants are also entitled to qualified immunity on the Eighth Amendment claims given that reasonable officials in the Defendants' shoes could have believed that the efforts to remediate any conditions related to inmate behavior concerning bodily excretions and noise making would establish that they were not being deliberately indifferent to Plaintiff's needs. Accordingly, Defendants are entitled to qualified immunity on the Eighth Amendment claims as well. See, e.g., Rivera v. Pa. Dept. Of Corrections, 837 A.2d 525 (Pa. Super. 2003) (finding no Eighth Amendment violations in the conditions of the LTSU similar to those alleged herein); Elliott v. Beard, 2006 WL 4404771, *5 (W.D.Pa. Sep 27, 2006)("Plaintiff's conditions of confinement claims resemble those set forth in *Rivera*, which were found not to constitute cruel and unusual punishment. As Defendants point out, the conditions complained about by Plaintiff are the result of the actions of other LTSU inmates, not Defendants. Plaintiff does not allege that Defendants do not respond to such actions. Thus, Plaintiff has failed to allege a violation of his Eighth Amendment rights with respect to the conditions of confinement in the LTSU.").

III.    CONCLUSION

In accordance with the Magistrate Judges Act, 28 U.S.C. § 636(b)(1)(B) & (C), and Local Rule 72.1.4 B, the parties are allowed ten (10) days from the date of service to file written objections to this report. Any party opposing the objections shall have seven (7) days from the date of service of the objections to respond thereto. Failure to timely file objections may constitute a waiver of any appellate rights.

---

[qualified immunity] cases requires that courts not consider intent when making the final determination at summary judgment of whether the law is clearly established."); Rakovich v. Wade, 850 F.2d 1180, 1189, 1210 (7th Cir. 1988) (en banc).

Respectfully submitted,

/s/  *Amy Reynolds Hay*
United States Magistrate Judge

Dated: 6 December, 2007

cc:     The Honorable David S. Cercone
        United States District Judge

        Albert Dantzler
        DZ-4398
        SCI Fayette
        P.O. Box 9999
        50 Overlook Drive
        Labelle, PA 15450

        Mariah Passarelli, Esquire
        By Notice of Electronic Filing