IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ALBERT DANTZLER, | ) |
| Plaintiff | ) |
| vs. | ) 2:05cv1727 <br> ) Electronic Filing |
| Secretary JEFFREY BEARD, Executive Secretary JOHN SHAFFER, WILLIAM STICKMAN, Regional Deputy Superintendent, JOHN DOE, Classification Officer, LANCE COUTERIER, Chief Psychologist, FRED MAUE, Chief Psychiatrist, JOSEPH FOLINO, Superintendent of SCI-Greene, KEN MILLER, Unit Manager, HARRY WILSON, Superintendent of SCI-Fayette, | ) Judge David S. Cercone/ <br> ) Magistrate Judge Amy Reynolds Hay |
| Defendants | ) |

## **MEMORANDUM ORDER**

AND NOW, this 18th day of March, 2008, after de novo review of the record and upon due consideration of the magistrate judge's report and recommendation filed on December 6, 2007, and defendant's objections thereto filed on January 25, 2008, and as otherwise interspersed in his submissions received since the issuance of the report and recommendation (Doc. No.s 84, 84-1, 87 & 90), IT IS ORDERED that Defendants' motion for summary judgement be, and the same hereby is, granted. The magistrate judge's report and recommendation as augmented herein is adopted as the opinion of the court.

Plaintiff's objections are without merit. Assuming plaintiff has met his burden of establishing the existence of a liberty interest in conjunction with being placed in the Special Management Unit ("SMU") and the Long Term Segregation Unit ("LTSU"), the record nevertheless entitles defendants to summary judgement. As noted by the magistrate judge, the record clearly establishes that plaintiff received sufficient process in conjunction with his Administrative Custody placement in the SMU and his ultimate transfer to the LTSU.

Specifically, plaintiff received notice of his placement in the SMU and periodic reviews with the Prison Program Review Committee of his progress toward being released from that placement. When he ultimately failed to maintain any sustained behavioral adjustment, he received notice of his pending transfer to the LTSU. He was held in the Restrictive Housing Unit until there was an opening of available space within the LTSU. Placement within the LTSU initially was for a period of ninety days. Report & Recommendation (Doc. No. 81) at 18 (citing supporting documentation). Plaintiff received an initial review within one day of being transferred to the LTSU, and thereafter received 30-day reviews until his first ninety day review on March 30, 2005. He received at least periodic 60 or 90-day reviews thereafter. Id. at 19. And as noted by the magistrate judge, plaintiff's own evidence shows that he was well aware of the reasons he was placed in the Unit, and he had access to attend and an opportunity to be heard at each of the periodic reviews, at least to the extent he elected to do so. Id. at 19 n. 15. The principles of Procedural Due Process require nothing more.

Moreover, to the extend plaintiff now attempts to (1) focus the trust of his contentions concerning the lack of notice and opportunity to be heard to highlight his assertions that he received only perfunctory reviews that were a sham and otherwise not meaningful, see Doc. No. 87 at 4, Doc. No. 84-2 at ¶¶ 37, 55-60, and (2) argue that material issues of fact remain because no court investigation occurred into his assertions, such attempts/objections are unavailing. Plaintiff's allegations essentially reduce to the proposition that he was entitled to a pre-placement hearing, and had a right to only be held in the SMU or LTSU for any period of time based upon criteria that are concrete, objectively verifiable and analytically sufficient. And because his allegations raise questions of fact about compliance with each of these premises, summary judgment is unwarranted. But the record and the law are otherwise.

The record reflects that the Prison Program Review Committee ("PRC") reviewed plaintiff's placement in the SMU within three days after he was received at SCI Greene for placement in that unit and that monthly periodic reviews by the PRC were conducted thereafter. See Doc. No. 56-2 at 30-59. Significant penological and psychological evaluations were undertaken as part of the decision to transfer plaintiff to the SMU. Id. at 22-29. An

individualized treatment plan for his transfer was devised. Id. at 28. Plaintiff remained on "Phase 5" within the unit "due to the severe threat and risk he presents at any DOC institution" during the first few months. By that juncture plaintiff had a record of infractions that clearly supported this assessment. At the monthly reviews that followed plaintiff requested reductions in his Disciplinary Custody based on good behavior and better adjustment to institutional life. He received these reductions and was able to progress through the phases of restriction over several months to Phase 1 before he reverted to serious misconduct that resulted in his return to Phase 5 placement. Plaintiff's refusals to attend a periodic review, which were only a few, were noted on the periodic review form. The PRC's rationale for its ongoing actions and the matters considered both with plaintiff and independently also were note on each PCR review form. A judicial review of the forms as a hole clearly provide an objective and analytically supportable rationale for the actions taken. Thus, plaintiff's bald assertion that his SMU reviews were perfunctory and meaningless cannot create a material issue of fact against the backdrop created by such a record.

The record also contains overwhelming support for the decision to transfer plaintiff to the LTSU and defendants' actions thereafter. By April 24, 2004, plaintiff had amassed 51 misconducts, the vast number of which reflected poor adjustment to institutional life and the potential danger he presented to staff, other inmates and himself. See Doc. No. 56-3 at 39. He had been sanctioned to at least 1857 days of Disciplinary Custody for these infractions, and had acquired 417 days of Disciplinary Custody during his time in the SMU. Id. at 40. He received a full review and assessment upon his placement in the LTSU in January of 2005 and was monitored over the next ninety days. He progressed during this period of time from a Phase IV level to Phase III, but reverted to serious misconduct warranting more restrictive treatment in the months that followed. During his monthly reviews it was noted that plaintiff displayed poor attitude and behavior, was influenced by the disruptive behavior of others in the LTSU and had a poor demeanor and attitude. He was demanding and disrespectful to staff. By July of 2005 he was improving but refused to participate in his monthly review. In August he had been displaying improved attitude and demeanor and it was recommended he be advanced to Phase II

restrictions. Although he was advanced, he received misconducts during the next thirty days and was placed back on Phase III restrictions. He displayed improvement in the early months of 2006 and was considered for Phase II placement on February 28, 2006, only to receive two misconducts and 60 days Disciplinary Custody as a sanction during the next thirty days. Plaintiff's behavior deteriorated over the summer and fall of 2006, resulting in his cut Disciplinary Custody being reinstated for misconduct such as attempting to assault an officer and displaying poor demeanor, attitude and behavior. It was noted each time plaintiff refused to participate in a monthly review. His recent behavior was summarized and the rationale and grounds for the Unit Team's recommended actions were clearly set forth in each monthly LTSU assessment. A judicial review of the forms as a hole clearly provide an objective and analytically supportable rationale for the actions taken. Thus, plaintiff's bald assertion that his LTSU reviews were perfunctory and meaningless cannot create a material issue of fact against the backdrop created by such a record.

Moreover, to the extent plaintiff seeks to challenge the review committees' assessments of his behavior and their determinations of an appropriate course of conduct in conjunction therewith, plaintiff's allegations of sham and meaningless reviews cannot create a material issue of fact for trial. The Supreme Court explained why substantial discretion must be given to prison administrators making determinations concerning threats to institutional security such as transfers to Administrative Custody pursuant to DC-ADM 802:

> In assessing the seriousness of a threat to institutional security, prison administrators necessarily draw on more than the specific facts surrounding a particular incident; instead, they must consider the character of the inmates confined in the institution, recent and longstanding relations between prisoners and guards, prisoners inter se, and the like. In the volatile atmosphere of a prison, an inmate easily may constitute an unacceptable threat to the safety of other prisoners and guards even if he himself has committed no misconduct; rumor, reputation, and even more imponderable factors may suffice to spark potentially disastrous incidents. The judgment of prison officials in this context, like that of those making parole decisions, turns largely on purely subjective evaluations and on predictions of future behavior.

Hewitt v. Helms, 459 U.S. 460, 474 (1983). In light of this discretion and the context in which it must be exercised, a prisoner receives adequate due process where he is given an opportunity to

contest the "purely subjective evaluations" of his dangerousness underlying the decision to place or continue him in Administrative Custody. Shoats v. Horn, 213 F.3d 140, 143-44 (3d Cir. 2000). And fulfillment of that opportunity may be accomplished through an "informal, non-adversarial review." Id. at 144.

The record clearly reflects that plaintiff consistently received an opportunity to contest the subjective evaluations leading to or continuing his placements, and his restrictions advanced or receded with his most recent behavior and the pertinent factors bearing on a prediction of his future behavior. Under such circumstances plaintiff's continued placement in Administrative Custody is supported by sufficient process and evidence to pass constitutional muster. Id. at 147.

Finally, plaintiff's effort to undermine the precedential force of Shoats by reference to Wilkinson v. Austin, 545 U.S. 209 (2005), is misplaced. Far from undermining Shoats, Wilkinson reaffirmed the controlling principles followed in Shoats with regard to the process which must be afforded when placements to confinement are atypical and impose a significant hardship as compared to ordinary prison life. The Court reiterated: "[w]here the inquiry draws more on the experience of prison administrators, and where the State's interest implicates the safety of other inmates and prison personnel, the informal, nonadversary procedures set forth in Greenholtz 442 U.S. 1, 99 S.Ct. 2100, 60 L.Ed.2d 668 (1979), and Hewitt v. Helms, 459 U.S. 460, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983), provide the appropriate model." Wilkinson, 545 U.S. at 228-29. As noted above, defendants have sufficiently provided such procedures and the record contains adequate evidence to support the constitutionality of defendants' placements of plaintiff. It follows that defendants' motion for summary judgment must be granted.

                              s/ David Stewart Cercone
                              David Stewart Cercone
                              United States District Judge

cc:      Honorable Amy Reynolds Hay
          United States Magistrate Judge

Albert Dantzler
DZ-4398
SCI Fayette
P.O. Box 9999
50 Overlook Drive
LaBelle, PA 15450

Mariah Passarelli, Esquire
Deputy Attorney General
Office of the Attorney General
6th Floor, Manor Complex
564 Forbes Avenue
Pittsburgh, PA 15219